Narish Miaram,

                Petitioner,

– against –

People of the State of New York, County of Queens,

                Respondent.

**MEMORANDUM & ORDER**

14-CV-00768 (ERK)

KORMAN, *J.*:

    Petitioner Narish Miaram (hereinafter "petitioner") was convicted of two counts of first-degree robbery, three counts of second-degree robbery, fourth-degree criminal possession of stolen property, fourth-degree grand larceny, second-degree identity theft, and second-degree forgery after a jury trial. Petitioner was sentenced initially to 18 years of imprisonment: two consecutive terms for imprisonment of nine years for each first-degree robbery count to be served concurrently with three five-year concurrent imprisonment terms for his three second-degree robbery convictions and one-year concurrent terms of imprisonment for each remaining count to run concurrently with the robbery sentences. On appeal, the sentence was reduced to nine years. Although the Appellate Division did not explain the mechanics of reaching that result, I presume that it did so by running concurrently the two nine-year sentences for first-degree robbery that were originally imposed to run consecutively. *People v. Mariam*, 97 A.D.3d 606, 607 (N.Y. App. Div. 2d Dep't 2012), *leave to appeal denied People v. Mariam*, 20 N.Y.1013 (2013). Proceeding pro se, petitioner filed this petition on May 14, 2014. By that point, he had served the full sentence imposed for all the offenses for which he was convicted except for first-degree robbery. Accordingly, to the extent that any of his claims relate to the offenses for which he has already

1

served his sentence, habeas corpus relief is not available. *See Maleng v. Cook*, 490 U.S. 488, 492 (1989) (holding that a petitioner does not remain "in custody" for a conviction once the sentence imposed for it has been fully served).

## Background

Petitioner's convictions arise from three separate robberies of livery-cab drivers in Queens, which I describe below. I refer to each robbery by the victim's name.

### 1. Romero Robbery

On March 20, 2007, Richard Romero was driving a livery cab in Queens when he picked up two passengers, neither of whom was petitioner. Trial Tr. 280:6–20, ECF No. 7. The two individuals robbed Romero at knifepoint, taking his Citibank debit card and taxpayer identification. *Id.* at 284:4–5. Two days later, Romero's stolen debit card was used to purchase $436.35 of merchandise at Edge Sportswear. *Id.* at 292:5–7, 294:16–22. The owner of Edge Sportswear, Anwar Qaeder, was working that day and had observed three individuals using Romero's debit card. *Id.* at 315:17–25. At trial, however, Qaeder could not identify these individuals. *Id.* at 316:16–20. On March 24, Romero's debit card was used to buy $834.47 of merchandise at Radio Shack. Hr'g Tr. 37:20; Trial Tr. 295:22–296:4. Romero did not authorize either transaction. Trial Tr. 294:22, 296:4. Romero reported the robbery and Detectives Kevin O'Hea and Timothy Feehan were assigned to his case.

On March 29, Detective O'Hea was downloading surveillance tape at Edge Sportswear when a female employee of the store told him that the man depicted in the tape using Romero's debit card had returned to the store. *Id.* at 339:16–341:6. O'Hea confirmed this identification by comparing the surveillance tape to the live feed from the store and then called Detective Feehan to report to the store. *Id.* at 341:7–341:23. O'Hea and Feehan subsequently arrested petitioner as

well as his friend Mohammed Raffi at the store for using Romero's stolen debit card. *Id.* at 342:21–343:15.

After the officers transferred petitioner to their precinct, Feehan read petitioner his *Miranda* rights. *Id.* at 522:18–22. Petitioner then provided oral and written statements to Feehan. He confessed that, "[a]fter the robbery I went to the Edge Store with Mohammed and Kim and we used the [Citibank] card that Mohammed stole from the Spanish guy." Hr'g Tr. 45:8–10. Petitioner acknowledged that he "spoke with Citibank on the phone because I had his taxpayer I.D. and his Citibank card" and that he had "signed the man's name" on the Edge Sportswear receipt. *Id.* at 45:10–14. Petitioner also said that he "bought a boost computer and laptop" at Radio Shack using Romero's Citibank card. *Id.* at 47:3.

### 2. Manhani Robbery

During the course of the foregoing interrogation, Feehan asked petitioner about the March 26, 2007 robbery of Sharjit Manhani, who also drove a livery vehicle. *Id.* at 63:10–64:1. Petitioner told Feehan that he, along with Mohammed Raffi and an unnamed man, had called a cab intending to rob it. Trial Tr. 528:10–12. According to petitioner, once Manhani began driving, Raffi told petitioner to "look out" and then Raffi "took out the knife and pulled the guy out of the driver's seat to the back by strangling him" before robbing him. *Id.* at 528:16–20. Manhani testified that the man holding the knife to his neck had said, "Give me the money or I am going to kill you." *Id.* at 468:11. While Manhani was being restrained, the other two men searched him and took his jacket, $400 in cash, five or six credit cards, and a $2,200 watch. *Id.* at 470:8–23. They then pushed Manhani from the car, and petitioner drove it away. *Id.* at 470:25, 529:2, 17–19. Police later recovered Manhani's car near his taxi company's office. *Id.* at 472:22–25.

3

Once petitioner confessed to helping rob Manhani, the detectives conducted a lineup at the police precinct, and Manhani identified petitioner as the man who had robbed him. Hr'g Tr. at 53:12–54:6; Trial Tr. 477:4–13. Following the confession and lineup, police officers transferred petitioner to Rikers Island. Trial Tr. 692:4–8. He was subsequently released on bail. *Id.* at 692:11–20.

### 3. Bawa Robbery

Petitioner's release turned out to be a mistake because shortly after his release, petitioner robbed another livery-cab driver. Specifically, on June 26, 2007, Hardev Bawa was driving a livery cab when he was dispatched to pick up a man that Bawa, the victim, later identified as petitioner. *Id.* at 383:12–385:23. After Bawa began driving, petitioner directed him to park on 179th Place. *Id.* at 386:13–15. Once Bawa parked, petitioner asked Bawa for his phone several times to make calls. *Id.* at 387:24–388:2. Petitioner used Bawa's phone three times before placing it in his own pocket, taking Bawa's car keys, and saying, "Don't move. Don't Move. I am going to kill you." *Id.* at 388:5–8. While threatening Bawa, petitioner reached for his right-front pocket. *Id.* at 388:9–11. Bawa feared that petitioner possessed a gun and was going to shoot him. *Id.* at 389:2–3. Bawa gave petitioner his wallet, which had a credit card, *id.* at 390:6–12, and then fled the car, *id*. at 389:16. Police subsequently recovered Bawa's car. *Id.* at 397:4–400:11.

On June 27, Bawa spoke with Detective Everosky regarding the robbery. *Id.* at 574:24–25. On July 5, Bawa emailed Everosky a copy of a business card that Bawa had received from the owner of the taxi stand, who knew petitioner. *Id.* at 393:11–15, 575:19–22. The card had petitioner's name and photograph on it. *Id.* at 576:2–3. Four days later, petitioner was arrested for the Bawa robbery. *Id.* at 578:4–16. While searching petitioner, police found Bawa's phone. *Id.* at 578:21–579:2. After police officers gave petitioner his *Miranda* warnings, *id.* at 580:3–

4

583:20, petitioner told police that Bawa and he had argued over cab fare and that he had then taken Bawa's car, *id.* at 584:1–9. Police later placed petitioner in a lineup, and Bawa identified petitioner as the man who had robbed him. Hr'g Tr. 16:16–19, Trial Tr. 396:15–18.

## Discussion

### 1. Legal Insufficiency for First-Degree Robbery (Bawa Robbery)

Petitioner first argues that the evidence was legally insufficient to find him guilty of first-degree robbery of livery cab driver Hardev Bawa, Count 16 of the indictment. Pet. 6, ECF No. 1. Evidence is legally sufficient if a rational jury, viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the defendant committed all the essential elements of the crime. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Appellate Division held on direct review that the prosecution had met its burden under the legal sufficiency standard, and it also held that the verdict was not contrary to the weight of the evidence. *Mariam*, 97 A.D.3d at 606; *see People v. Cahill*, 2 N.Y.3d 14, 58 (2003) ("A guilty verdict based on a legally sufficient case is not the end of our factual analysis but the beginning of our weight of the evidence review."). On habeas review, a "federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). A petitioner faces a high burden to succeed on this claim when "the deference to the state court decisions required by § 2254(d) is applied to the state court's already deferential review" of the evidence. *Id.* at 6.

A defendant commits first-degree robbery in New York by (1) forcibly stealing property and (2) in the course of fleeing, the defendant or another participant displays what appears to be a firearm. N.Y. Penal Law § 160.15(4). "[T]he display requirement has been construed broadly to

5

cover a wide range of actions which might reasonably create the impression in the mind of the victim that the robber is armed with a firearm." *People v. Lopez*, 73 N.Y.2d 214, 220–21 (1989); *see also People v. Haney*, 162 A.D.2d 613, 613–14 (N.Y. App. Div. 2d Dep't 1990) (upholding conviction for first-degree robbery when the defendant put his hand in his pocket, gestured in a manner that caused the victim to think that defendant had a gun, and said, "don't let me hurt you").

The facts of this case are similar to those in *Haney*. Bawa testified that when petitioner took Bawa's cell phone and car keys, he threatened to kill Bawa while putting his hand in his right pocket. Trial Tr. 388:5–25. Bawa feared that petitioner possessed a gun based on "the way [petitioner] put[] his hand" in his pocket. *Id.* at 389:6–7; 420:8–21. Based on this testimony and its previous construction of New York Penal Law § 160.15(4), the Appellate Division's holding that the evidence was legally sufficient to sustain the conviction was not unreasonable.

### 2. Failure to Instruct on Affirmative Defense to First-Degree Robbery (Bawa Robbery)

Petitioner next claims that the trial judge erred in her instructions to the jury on the Bawa robbery. Pet 4. The trial judge instructed the jury that "the People must prove that . . . defendant forcibly stole property from Hardev Bawa, [and] in the course of the commission of the crime, defendant displayed what appeared to be a firearm." Trial Tr. 857:12–18. Under New York law, it is an affirmative defense to the firearm display requirement that the "firearm was not a loaded weapon from which a shot . . . could be discharged." N.Y. Penal Law § 160.15(4). If a defendant proves this affirmative defense by a preponderance of the evidence, *id.*; N.Y. Penal Law § 25.02, the conviction is reduced to second-degree robbery, N.Y. Penal Law § 160.15(4). The maximum term that a defendant may serve for second-degree robbery is fifteen years. *See* N.Y. Penal Law § 70.02(1)(b); § 70.02(3)(b); § 160.10. Petitioner contends that the trial judge should have instructed the jury on this affirmative defense. Pet. 4. At the pre-charge conference, defense

6

counsel had indicated that at the close of trial, he might request a charge on the affirmative defense to the display requirement. Trial Tr. 613:7–11. Nevertheless, he made no such request when the trial judge instructed the jury without mentioning this affirmative defense. *Id.* at 867:2–3. The Appellate Division held the claim unpreserved on direct review because trial "counsel neither requested the charge nor objected to its absence." *Mariam*, 97 A.D.3d at 607. Thus, this claim is procedurally forfeited. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

The Appellate Division also held that the claim was meritless because such a charge would have been warranted under New York law only if petitioner, who bore the burden of establishing this affirmative defense by a preponderance of the evidence, had offered evidence that he had used an inoperable firearm to rob Bawa. *See Miaram*, 97 A.D.3d at 607. Because the petitioner did not possess a firearm to begin with and was guilty of the offense only because he engaged in conduct, which might reasonably create the impression in the mind of the victim that he was armed with a firearm, *see Lopez*, 73 N.Y.2d at 220–21, such a charge would have made no sense. Moreover, the Supreme Court has not held that the failure to instruct an affirmative defense violates the due-process clause. *See Gilmore v. Taylor*, 508 U.S. 333, 340–41 (1993). Rather, the Court has left this issue open, noting that:

> The cases following *Cupp* in the *Winship* line establish that States must prove guilt beyond a reasonable doubt with respect to every element of the offense charged, but that they may place on defendants the burden of proving affirmative defenses. . . . The State argues that these later cases support the proposition that any error committed in instructing a jury with respect to an affirmative defense, which does not lessen the State's *Winship* burden in proving every element of the offense charged beyond a reasonable doubt, is one wholly of state law. . . . We need not address this contention.

*Id.* at 341; *see id.* at 351 (O'Connor, J., concurring) ("[O]ur cases do not resolve conclusively the question whether it violates due process to give an instruction that is reasonably likely to prevent

7

the jury from considering an affirmative defense."). The majority opinion did note that "[t]he most that can be said of the instructions given at [defendant's] trial is that they created a risk that the jury would fail to consider evidence that related to an affirmative defense, with respect to which *Winship's* due process guarantee does not apply." *Id.* at 343.

Moreover, the only relief that petitioner should obtain if successful on this claim is a reduction in the offense of conviction from first-degree to second-degree robbery (making a total of three second-degree robbery convictions). Under these circumstances, he would not be entitled to any meaningful relief. The Appellate Division modified petitioner's sentence so that he served his sentences for all convictions concurrently. *Mariam*, 97 A.D.3d at 606. Thus, even if his conviction for the robbery of Bawa was reduced to second-degree, petitioner would still have to serve nine years in prison for the first-degree robbery of Sharjit Manhani.

### 3. Ineffective Assistance of Counsel (Romero and Manhani Robberies)

Petitioner's third claim is that his trial counsel provided ineffective assistance by not moving during trial to reopen the *Dunaway* hearing to suppress (1) his March 29th post-arrest confession regarding the Romero and Manhani robberies and (2) a March 29th lineup where Manhani identified petitioner as the man who had robbed him. Pet. 6–12. According to petitioner, he was arrested without probable cause, and thus evidence following his arrest should have been suppressed. *Id.*

At the pre-trial *Dunaway* hearing, Detective Feehan, one of the two arresting officers, testified about the March 29th arrest. Feehan had been assigned to investigate the Romero robbery. Hr'g Tr. 35:19–22. On March 29th, Feehan watched a previously recorded surveillance tape from Edge Sportswear in which three individuals had used Romero's stolen debit card. *Id.* at 37:23–38:3. Feehan then returned to his precinct and had Detective O'Hea go to Edge Sportswear and

8

download the previously recorded surveillance tape. *Id.* at 36:8–10. According to Feehan, O'Hea subsequently called Feehan and told him to come back to Edge Sportswear because Anwar Qaeder, the owner of the store, had just seen a person from the surveillance tape re-enter the store. *Id.* at 38:13–17. When Feehan arrived at the store, he arrested petitioner based on Qaeder's identification as well as his own identification from having viewed the previously recorded surveillance tape. *Id.* at 39:17–23; 59:20–23. At trial, however, Qaeder could not identify petitioner. Trial Tr. 316:16–17. Based in part on Feehan's testimony, the trial judge found probable cause for the March 29th arrest. Suppression Hr'g Decision 2:24–3:1, ECF No. 7–1 SR_18–19.

At the trial, Detective O'Hea testified to a slightly different account of petitioner's arrest. According to O'Hea, he was reviewing the surveillance tape at Edge Sportswear when a female employee, not Qaeder, approached him and told him that the person depicted in the tape had just returned to the store. Trial Tr. 339:13–340:21. O'Hea confirmed the employee's statement by comparing the tape to the live feed. *Id.* at 340:19–340:21. He then called Detective Feehan who came to the store. *Id.* at 341:22. When O'Hea walked down to the store floor, Feehan had already arrived, and they arrested petitioner together. *Id.* at 342:24–343:1. Petitioner argues that Feehan's and O'Hea's testimony was inconsistent. In particular, petitioner observes that Feehan had testified that Qaeder, who could not identify petitioner at trial, had previously identified petitioner, *id.* at 316:16–17, and O'Hea testified that a female employee had made the initial identification, *id.* at 339:13–340:21. Based on this alleged discrepancy, petitioner argues that his trial counsel acted ineffectively by failing to re-open the *Dunaway* hearing to try to suppress petitioner's confession and Manhani's out-of-court identification of petitioner.

9

The success of an ineffective assistance of counsel claim is dependent upon a showing that (1) "counsel's representation fell below an objective standard of reasonableness" and that (2) "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687–88 (1984). The first prong requires that courts recognize counsel's "wide latitude" in making tactical decisions and imposes a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The second prong requires that a defendant "show[] that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 694.

The Appellate Division's ruling that petitioner received effective assistance of counsel, *Mariam*, 97 A.D.3d at 607, is now subject to a "doubly deferential" standard of review, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). The discrepancy to which petitioner points could not have altered the finding that there was probable cause for the arrest. First, it was immaterial whether Qaeder or a female employee said that petitioner had returned to the store. The police officers could have reasonably relied on either identification. Second and more significantly, before they made the arrest, both officers independently identified the petitioner, having previously viewed the surveillance tape showing petitioner using Romero's Citibank card at Edge Sportswear. Hr'g Tr. 59:20–23, Trial Tr. 341:7–341:23. Indeed, the still images produced from that surveillance tape clearly show petitioner's face. *See* Tr. Exs. 5-A, 5-B. Thus, the failure of petitioner's counsel to move to re-open the suppression hearing does not satisfy either prong of *Strickland*, and the Appellate Division's rejection of petitioner's claim was not unreasonable.

4. **Confrontation Clause (Romero Robbery)**

Petitioner next argues that his rights under the Confrontation Clause were violated. Pet 12–15. At trial, Detective O'Hea testified that while he was downloading the surveillance video

at Edge Sportswear, a female employee told him that "[t]he gentlemen is here in the store." *Id.* at 339:17–19. Detectives O'Hea and Feehan subsequently arrested petitioner at the store. *Id.* at 342:24–343:1. Defense counsel objected to this testimony, and the trial judge instructed the jury that it "doesn't come in for the content of its truth." *Id.* at 339:22–23. The trial judge further told the jury that the evidence "simply comes in for purposes of conveying what this detective heard for the purposes of how he acted to it. . . . It doesn't come in for the content of the truth of the words actually spoken." *Id.* 340:2–9. Defense counsel did not object to this limiting instruction.

The Appellate Division held the claim unpreserved for direct review, *Miaram*, 97 A.D.3d at 606, and it is thus procedurally forfeited, *see Wainwright*, 433 U.S. at 87. The Appellate Division also held the claim to be "without merit." *Miaram*, 97 A.D.3d at 606. This ruling on the merits is subject to the deference prescribed by 28 U.S.C. § 2254(d)(1). "This [deferential] standard is difficult to meet" because it "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J. concurring in judgment)).

The Supreme Court has held that out-of-court statements offered for reasons other than the truth do not trigger the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004); *see also United States v. Paulino*, 445 F.3d 211, 216 (2d Cir. 2006) (holding that the Confrontation Clause was not implicated when the trial judge "ably controlled the use of the evidence . . . to ensure that it was not used by the government for its truth"). Here, the trial judge instructed the jury that the officer's testimony was not admitted for the truth, but for the detective's reaction to the employee's statement. The Appellate Division's ruling on the merits was correct. Moreover, the admission of evidence, if error, was harmless, not only because "juries are presumed to follow

[limiting] instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), but also because the police officers, who had viewed the surveillance videotape, testified that they recognized petitioner from that tape. Again, the jury viewed the surveillance tape at trial, Trial Tr. 608:18–19, and could independently assess the officers' credibility. Indeed during deliberations, the jurors, upon request, re-watched the videotape twice. *Id.* at 873:16–874:9.

    5. **Suppression of *Brady* Material (Manhani Robbery)**

Petitioner's fifth claim is that the prosecution suppressed *Brady* material by waiting until mid-trial to disclose information regarding a knife obtained from Sharjit Manhani's taxi cab that was tested for DNA and fingerprints. Pet. 15. Before testimony began on the second day of trial, the trial judge informed defense counsel that the prosecution had "represented this morning [that] they just found out either yesterday or the day before that . . . there was a knife and razor recovered from [Manhani's] vehicle. . . . [T]hey hope, sometime this morning, to come up with whatever the results of that DNA testing was." Trial Tr. 377:1–8. Over defense counsel's objection, the trial judge continued the trial because Hardev Bawa was testifying that day rather than Manhani. *Id.* at 378:3–10. After Bawa testified, the prosecution told the court that "[t]he result of the testing [of the knife] indicated the only DNA recovered was a very small amount. It is such a minimal amount of DNA that they were unable to track it to a man or a woman beyond being most likely human. . . . It is such a minimal amount of information that it was rendered useless." *Id.* at 435:8–436:8. The parties and the trial judge then held an off-the-record sidebar conference after which defense counsel did not raise any objections or motions and the trial resumed. *Id.* at 436:16–17.

In a pro se supplemental brief on direct review, petitioner contended that because the prosecutor had waited until the middle of trial to "turn[] over this patently obvious *Brady* material," the knife "lost its exculpatory value, and it was too late for counsel . . . to test the knife in question."

12

Resp't's Ex. 1, SR_075. The Appellate Division held petitioner's *Brady* claim as "without merit," *Miaram*, 97 A.D.3d at 607, and so AEDPA deference applies.

The Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Favorable evidence includes exculpatory and impeachment evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." *Id.* at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Though the prosecution need not disclose *Brady* material before trial, defense counsel must have an "opportunity to use the evidence [once] disclosure is made." *Leka v. Portuondo,* 257 F.3d 89, 100 (2d Cir. 2001).

In the instant case, the knife did not contain any identifiable DNA. The only helpful evidence that could theoretically have been found by an expert witness retained by petitioner would have been the DNA of another person. This would not have exculpated petitioner because the testimony at trial established that petitioner and two friends together robbed Manhani. Indeed, in a written statement admitted at trial, petitioner confessed that he sat in the cab and served as a lookout while his friends "took out the knife, pulled [Manhani] out of the driver's seat . . . [and] start[ed] robbing him." Trial Tr. at 528:17–19, 529:1. Manhani partially corroborated petitioner's confession when he identified petitioner at trial as "the one that put the knife on my neck and asked

13

me for my money." *Id.* at 477:9–10. Consequently, there is no reasonable probability that petitioner's alleged inability to retest the knife for DNA prejudiced him in any way. *See Portuondo*, 257 F.3d at 104 ("Materiality [for *Brady* purposes] is assessed in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted.").

6. **Compliance with New York Criminal Procedure Law § 310.30 (Romero and Bawa Robberies)**

Lastly, petitioner repeats the claim (argued in his pro se supplemental brief to the Appellate Division) that "[t]he trial court, in responding to three jury requests, committed several reversible . . . errors when it failed to comply with the requirements of Criminal Procedure Law § 310.30." Resp't's Ex. 1, SR_078. I reject this purely state-law claim for the reasons stated in the memorandum of law filed by the Respondent in opposition to the petition. *See* Mem. of Law in Opp'n to the Pet. 55–61, ECF No. 7–2.

## CONCLUSION

The petition is denied. I also deny a certificate of appealability.

**SO ORDERED.**

Brooklyn, New York
January 29, 2016

*Edward R. Korman*
Edward R. Korman
United States District Judge